IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Michael Bernard Lesane, # 258515, | ) C/A No. 2:12-508-JMC-BHH |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **REPORT AND RECOMMENDATION** |
| | ) **AND ORDER** |
| William Byars, Dept. of Corrections | ) **OF MAGISTRATE JUDGE** |
| Director; Anthony Padula, Warden; Major | ) |
| James Dean; Capt. A. Pinkney; Lt. B. | ) |
| Durant; Sgt. Epps; Lt. Commandeer; Lt. | ) |
| Goodman; Officer Lighty, et al.; Dr. Stein; | ) |
| Nurse Fulton; Nurse Scott; Nurse Floyd; | ) |
| Nurse McCallaster, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

The Plaintiff, Michael Bernard Lesane ("Plaintiff"), is a state prisoner currently

housed in the Wateree Correctional Institution of the South Carolina Department of

Corrections ("SCDC"), in Rembert, South Carolina.  Plaintiff, who is proceeding pro se and

in forma pauperis, brings this action, pursuant 42 U.S.C. § 1983, alleging that Defendants

violated his constitutional rights by subjecting him to excessive force, illegal detention, cruel

and unusual punishment, an illegal search and seizure, and violation of his due process

rights.[1]  At the time of the events giving rise to this action, on May 25, 2011, Plaintiff was

_____

[1] Not itself a source of substantive rights, § 1983 is the procedural mechanism
through which Congress provided a private civil cause of action based on allegations of
federal constitutional violations by "person(s)" acting "under color of state law."  *See
Jennings v. Davis*, 476 F.2d 1271 (8th Cir. 1973).  The purpose of § 1983 is to deter
state actors from using the badge of their authority to deprive individuals of their
federally guaranteed rights and to provide relief to victims if such deterrence fails.  *See
McKnight v. Rees*, 88 F.3d 417(6th Cir. 1996).  To state a cause of action under 42
U.S.C. § 1983, a plaintiff must allege that: (1) individual defendant(s) deprived him of
a federal right, and (2) did so under color of state law.  *Gomez v. Toledo*, 446 U.S. 635,
640 (1980); *see Hall v. Quillen*, 631 F.2d 1154, 1155-56 (4th Cir. 1980).

incarcerated in SCDC's Lee Correctional Institution ("Lee CI") in Bishopville, South Carolina. All of the Defendants were employees of the SCDC, at the time of the events.

This matter is before the Court upon Defendants' Motion for Summary Judgment ("Motion," ECF No. 35), filed pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Plaintiff's "Motion to Amend Response to Summary Judgment" (ECF No. 44), and Plaintiff's Motion to Compel (ECF No. 54).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving pro se litigants are referred to a United States Magistrate for consideration.

## PROCEDURAL HISTORY AND FACTS

Plaintiff's original Complaint (ECF No. 1) was filed on February 23, 2012, together with a Motion for Leave to Proceed in forma pauperis (ECF No. 2) and a Motion to Appoint Counsel (ECF No. 3). By Order dated March 1, 2012 (ECF No. 8), Plaintiff was granted leave to proceed in forma pauperis, and ordered to bring the case into proper form by submitting proposed service documents for Defendants. On March 22, 2012, Plaintiff filed a Motion to Amend his Complaint (ECF No. 11), which was granted by Docket Text Order (ECF No. 13), on March 23, 2012. On April 6, 2012, Plaintiff filed his Amended Complaint (ECF No. 16) and proposed service documents and, by Order dated April 13, 2012 (ECF No. 19), service of the Amended Complaint was authorized.

Defendants filed their Motion for Summary Judgment (ECF No. 35) on September 24, 2012. By Order dated September 25, 2012 (ECF No. 36), pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the Motion. Plaintiff

2

requested an extension of time in which to respond (ECF No. 38), which was granted (ECF No. 39). On November 21, 2012, Plaintiff filed his Response in Opposition (ECF No. 41), to which Defendants filed a Reply (ECF No. 43), on December 3, 2012.

On December 4, 2012, Plaintiff filed his aforementioned Motion to Amend his Response to Plaintiff's Summary Judgment Motion and to further amend his Amended Complaint (ECF No. 44), by adding Dr. Thomas Moore as a Defendant. On December 21, 2012, Defendants filed their Response in Opposition to Plaintiff's Motion to Amend (ECF No. 51), asserting that "[t]he fact that a party may be jointly and severally liable for damages with a non-party does not make the non-party a necessary party," Adkins v. Labor Ready, Inc., 205 F.R.D. 460, 463 (S.D.W.Va. 2001). Defendants contend that Plaintiff's motion to add Dr. Moore as a required party should be denied as futile. Plaintiff filed a Reply to Defendants' Response (ECF No. 52), on January 7, 2013.

On June 11, 2013, Plaintiff filed a Motion to Compel (ECF No. 54), seeking the production of three SCDC policies: HS-18.19 "Refusal of Medical Care," HS-18.12 "Informed Consent," and OP-22.01 "Use of Force," alleging that SCDC Policy GA.01-05 forbids inmates from copying documents such as policies, and Plaintiff needs Defendants to provide him with copies of these policies, which are relevant to this Court's review of the claims raised in his Amended Complaint. Plaintiff also requested that the Court compel Defendants to provide Plaintiff with the findings and conclusions by the DOI who investigated Plaintiff's complaint about his treatment on May 25, 2011, as well as a copy of the prisoner/physician relationship policy. (Motion to Compel, ECF No. 54).

On June 28, 2013, Counsel for Defendants filed their Response in Opposition to Plaintiff's Motion to Compel (ECF No. 55), in which they state they received Plaintiff's First

3

request for Production of Documents on December 27, 2012, and timely served their responses, on February 4, 2013, attaching a copy as Exhibit A. Counsel for Defendants state they were served with Plaintiff's Second Request for Production of Documents on April 29, 2013, and timely served responses to those requests, on May 28, 2013, attaching a copy as Exhibit B. Defendants' Response contains a copy of the SCDC's Office of Inspector General's Division of Investigation's report of the May 25, 2011 incident involving Plaintiff (ECF No. 55-1, p. 10-31), and a copy of Dr. Thomas Moore's undated policy memorandum policy (ECF No. 55-2, p. 8) concerning catheterization of inmates who are unable to urinate for drug screens. Defendants object to Plaintiff's request to produce SCDC Policy HS-18.19 "Refusal of Medical Care," Policy HS-18.12 "Informed Consent," Policy OP-22.01 "Use of Force," "the findings and conclusions by the DOI concerning this incident after its investigation," "a copy of the letter sent to Dr. Thomas Moore by General Counsel David Tatarsky expressing his views on this matter," "a statement of how this procedure has been rectified by Dr. Moore as stated in the investigative report," and a copy of SCDC's "prisoner/physician relationship policy." See ECF No. 55-1, 55-2.[2]

_____

[2]Plaintiff's Motion to Compel (Dkt. No. 54) is GRANTED IN PART and DENIED IN PART. Plaintiff seeks production of the following SCDC policies: (a) "Refusal of Medical Care" (Policy HS-18.19); (b) "Informed Consent" (Policy HS-18.12); and (c) "Use of Force" (Policy OP-22.01). (See Dkt. No. 54.) Plaintiff also requested that the Court compel Defendants to provide Plaintiff with the findings and conclusions by the DOI who investigated Plaintiff's complaint about his treatment on May 25, 2011, as well as a copy of the prisoner/physician relationship policy.

Defendants objected to production of some of these policies because the policies are restricted. (Dkt. No. 54-1.) To the extent the policies are restricted, the undersigned would not order production, and Plaintiff's motion is denied. The undersigned will not order SCDC to produce restricted policies. See, e.g., Nicholas v. Ozmint, No. 8:05-3472-RBH, 2006 WL 2711852, at *5 (D.S.C. Sept. 20, 2006).

However, Defendants' objection that Plaintiff has access to policies in the law library is not an appropriate response to an otherwise well-founded discovery request.

4

Plaintiff alleges that Defendants illegally detained him in Lee CI's medical unit to perform an illegal catheterization.  (Amended Complaint, ECF No. 16, p. 2).  Plaintiff alleges that the medical procedure was done without his consent, and that he still has trouble urinating and experiences slight abdominal pain, as result.  Id.  Plaintiff alleges that Defendants are not acknowledging the fact that Plaintiff refused the procedure and are lying about the facts.  Id.  Plaintiff alleges that he was charged with a disciplinary violation, and the incident report states that Plaintiff refused the procedure.  Id.  Plaintiff alleges that the charge was subsequently dismissed and, in the institutional response to the Step 2 grievance that Plaintiff filed in connection with the incident, Defendants claim that Plaintiff agreed to the procedure.  Id.

Specifically, Plaintiff alleges that, between 9:00 a.m. and 10:00 a.m. on May 25, 2011, he told Officer Samuel, who was on duty in Lee CI's Chesterfield Unit, that he had a headache.  (Amended Complaint, ECF No. 16, p. 3).  Officer Samuel called Medical and was told to send Plaintiff up there.  Plaintiff alleges that, when he got to Medical, about 30 minutes later, he was seen by Nurse Scott and another female nurse, who took his vital signs, and gave the information to Nurse Floyd, who supposedly gave it to Dr. Steen.[3]  Id.

---

Thus, to the extent the requested policies are not restricted, Plaintiff's motion is granted, and Defendants are ordered to produce such policies to Plaintiff within five days of the date of this Order.

Finally, to the extent Plaintiff requests the findings and conclusions of the DOI, it appears Plaintiff has received all of those documents. (See Dkt. No. 55-1 at 10-26 of 31.) That request is therefore denied.

[3]  Plaintiff initially identified this Defendant as "Dr. Stein," but Defendants's Motion states that his correct name/spelling is Dr. Steen.  The following Defendants' names have also been corrected by Defendants: Lt. Commander (not "Comandeer"), Nurse McCaskill (not "McCallaster").  (Motion, ECF No. 35-1, p. 1).  The undersigned takes judicial notice of the fact that Defendant Byars correct name is Byars, not "Byers."  See

Plaintiff alleges that Nurse Floyd came back and wanted Plaintiff to take a urinalysis test. When Plaintiff asked to talk with doctor first, Nurse Floyd refused. Plaintiff alleges that he then decided to return to the Chesterfield unit, but Nurse Floyd et al. told Officer Lighty not to let Plaintiff leave the medical unit, and Officer Lighty ordered Plaintiff to be seated in the back. Id.

Plaintiff alleges that, 20 to 30 minutes later, Maj. Dean and Capt. Pinkney came to the medical unit and Maj. Dean again asked Plaintiff to take a urinalysis test. Plaintiff alleges that he refused and told Maj. Dean to let him speak to the doctor. Maj. Dean refused Plaintiff's request, then ordered Plaintiff to put his hands against the wall. Plaintiff alleges that he complied with Maj. Dean's order and was handcuffed, then told by Maj. Dean that they were going to shackle Plaintiff and take him in the back room to perform a catheterization. Plaintiff alleges that Maj. Dean asked him to submit a urine sample, but Plaintiff refused and asked, again, to speak to the doctor. Maj. Dean then called Lt. B. Durant, Lt. Commander, Lt. Goodman, and Sgt. Epps to the medical unit. Id. Plaintiff alleges that, when these officers finally arrived, Lt. Durant put leg irons on Plaintiff, and Maj. Dean again asked Plaintiff to submit a urine sample. (Amended Complaint, ECF No. 16-3, p. 4). Plaintiff alleges that he still refused and asked to speak to the doctor, and was again refused permission to speak to the doctor. Maj. Dean then ordered Plaintiff to go into the room, and Plaintiff was escorted to the bed in the room by Epps, Commander, and Durant.

---

http://www.doc.sc.gov/pubweb/contact.jsp (last visited July 30, 2013); Williams v. Long, 585 F. Supp. 2d 679, 685-89 (D. Md. 2008) (collecting cases in which courts have held that postings on government websites are inherently authentic or self-authenticating).

Plaintiff alleges that he refused to lie on the bed, but Maj. Dean screamed at him to get on the bed, and the officers pulled and held Plaintiff down on the bed. Id.

Plaintiff alleges that Nurse Floyd and Nurse Fulton snatched off his pants and started the catheterization process. Nurse Fulton held Plaintiff's penis in her hands and swabbed it with some brown looking liquid, got a red tube from Nurse Floyd, then inserted the tube into Plaintiff's penis up to his bladder. Plaintiff alleges that, during this procedure, Capt. Pinkney, Officer Lighty, and Nurse McCaskill were looking in and laughing through the window. After Nurse Fulton filled the test cup, Plaintiff was left with his genitals exposed for at least 10 minutes before Maj. Dean ordered them to pull up Plaintiff's pants. Plaintiff alleges that Dr. Steen came in after that and started asking Plaintiff questions about his headache. Nurse McCaskill offered Plaintiff a pill, but Plaintiff refused. Plaintiff alleges that he was placed in the holding cell during count time and then sent back to Chesterfield unit. Id.

Plaintiff alleges that Defendants acted wantonly and recklessly and violated the policy and procedures of HS-18.12 of the Health Services. Plaintiff alleges that they did not get a warrant from any judicial authority to perform the catheterization, in violation of the 4th Amendment. Plaintiff alleges that the search was performed in front of and by female members, Capt. Pinkney, Officer Lighty, Nurse McCalskill, and Nurse Fulton. Plaintiff alleges that the forced catheterization violated Plaintiff's 4th, 8th, and 14th Amendment rights, and constituted cruel and unusual punishment, a due process violation, and an illegal search and seizure. (Amended Complaint, ECF No. 16-3, p. 4-5).

Plaintiff seeks compensatory damages of $25,000 against each defendant, jointly and severally, and punitive damages in the amount of $20 million. Plaintiff seeks a

7

declaration that Defendants' conduct was an act of rape/sexual assault. Plaintiff also seeks a preliminary and permanent injunction ordering Defendants not to subject Plaintiff to any more invasive techniques and to release Plaintiff from Defendants' custody into federal custody. (Amended Complaint, ECF No. 16-3, p. 6).

Plaintiff submitted a sworn affidavit, (Plaintiff's Aff., ECF No. 41-2), in support of his Response in Opposition to Defendants' Motion ("Opposition," ECF No. 41). Plaintiff's affidavit essentially restates the factual allegations in his Amended Complaint, and elaborates on a couple of issues. Plaintiff's affidavit notes that: he was the only prisoner in the medical unit at that time; when Nurse Scott took his vitals, she said that Plaintiff had an increased heart rate; when Nurse Floyd refused to allow Plaintiff to leave the medical unit, she blocked his path, and told Officer Lighty to make him sit back down, and Lighty pulled out her mace, so Plaintiff sat back down; Capt. Pinkney began shaking her mace can as Maj. Dean yelled at Plaintiff to put his hands behind his back to be handcuffed; Maj. Dean told Plaintiff that if he didn't give a urine sample they were going to shackle him and catheterize him, when Plaintiff asked what that meant, Maj. Dean told him; before Plaintiff was escorted into the room where the procedure took place, Dr. Steen appeared and said he wanted to see if Plaintiff had any drugs in his system and, when Plaintiff tried to ask him questions, Dr. Steen threw up his finger as if he didn't want to hear it and left; Plaintiff laid down on the bed when he was told to do so, but when Nurse Floyd came in with the catheter he got off of the bed and Maj. Dean yelled at him to get back on the bed, while Lt. Durant, Sgt. Epps, and Lt. Commander pushed Plaintiff back down and held him; Dr. Steen did not explain anything to Plaintiff before the catheterization. (Plaintiff's Aff., ECF No. 41-1, p. 2-5).

8

Defendants Memorandum in Support of their Motion (ECF No. 35) presents a factual summary and includes attachments comprised of five sworn affidavits and a copy of SCDC's drug testing/screening policy.  The attachments are: (1) affidavit of Ann Hallman, (Hallman Aff., ECF No. 35-2); (2) affidavit of Dr. Ronald Steen, (Steen Aff., ECF No. 35-3); (3) affidavit of Nurse McCaskill, (McCaskill Aff., ECF No. 35-4); (4) affidavit of Nurse Fulton, (Fulton Aff., ECF No. 35-5); (5) affidavit of Sharon Patterson, Disciplinary Hearing Offcier, Patterson Aff., ECF No. 35-6); and (6) exhibit SCDC Inmate Drug Testing/Screening Program Policy GA-03.03 (Policy GA-03.03, ECF No. 35-7).

The affidavits of Defendants Dr. Steen, Nurse McCaskill, and Nurse Fulton paint a much different picture of events from Plaintiff's version.

Dr. Steen's affidavit alleges:

> I am currently employed by Barnwell County Hospital as a physician.  At the time of the events giving rise to this case, I was employed by the South Carolina Department of Corrections as a physician. I have been practicing as a physician for the last thirty-one years.  I am familiar with the allegations of Plaintiff's Amended Complaint and have reviewed the medical records maintained by SCDC related to the allegations asserted by Plaintiff. Plaintiff's medical encounters are attached hereto as Exhibit A.  On May 25, 2011, Plaintiff presented in the Lee Correctional Institution Infirmary complaining of debilitating headaches.  Plaintiff's vitals were taken which showed Plaintiff's heart rate registering at 133.  A heart rate of 133 is extremely elevated and is known as tachycardia which can be a life threatening condition.  I reviewed the Plaintiff's vitals and conducted a physical examination.  Plaintiff was jittery and I was immediately concerned he may be under the influence of a narcotic or have some sort of narcotic in his system.  I determined that I needed to treat the abnormal heart rate. I felt a urine test was warranted and medically necessary in order to rule in or out certain stimulate agents in the Plaintiff's system.  I dd not want to administer a narcotic for Plaintiff's tachycardia that could couteract with a stimulate already in Plaintiff's system.  For instance, if a patient is under the influence of a stimulate and is administered a beta blocker, the heart can be overtaxed and death can occur.  I asked the Plaintiff to submit to a urine test in a cup and he would not provide it.  I explained that the urine test was medically necessary and I could not treat him without screening his urine for any

foreign substances. I informed him I would order a cathe[te]rization to collect the sample if necessary. He understood and did not voice any verbal objections or refusal to my ordering a cathe[te]rization procedure. I left to attend to other issues. I was then informed that the sample was collect by Nurse Fulton without any complications or objections and pursuant to the cooperation of the Plaintiff. The urine test was positive for THC or marijuana. The Plaintiff continued to exhibit jittery behavior and I thought it necessary to administer Lopressor to bring his heart rate down to a normal level. I performed another physical examination and determined medication management was medically necessary. I gave a verbal order to Nurse McCaskill to administer 25 mg of Lopressor. However, Plaintiff refused the Lopressor. Plaintiff refused medical treatment. I explained the ramifications of Plaintiff's refusal to accept medical treatment and Plaintiff was discharged from the infirmary for noncompliance and refusal of medical treatment. All medical treatment rendered to Plaintiff was appropriate and within the accepted standard of care. At no time did I personally hear Plaintiff refuse the cathe[te]rization procedure nor am I aware of Plaintiff stating his objections or refusal to a medical staff member. He did not fight or object to the procedure to my knowledge.

Steen Aff., ECF No. 35-3, p. 1-3.

Nurse McCaskill's affidavit alleges:

On May 25, 2011, the Plaintiff presented to the Lee Correctional Institution Infirmary complaining of severe headaches. I was not present when the Plaintiff first presented though I became aware of his presence when I heard a commotion in the hallway. I entered the hallway and observed the Plaintiff in the hallway. I approached the Plaintiff and inquired as to what was wrong and the Plaintiff informed me he wanted to speak with Dr. Steen. I retrieved Dr. Steen and brought Dr. Steen to the Plaintiff. Pursuant to the medical records, Dr. Steen informed the Plaintiff that he had a very high heart rate and Dr. Steen was concerned with the heart rate. Dr. Steen informed the Plaintiff that he needed a urine sample to ensure the Plaintiff did not have substances in his system that may counteract with any medications he administered to combat the tachycardia. Dr. Steen explained that the urine test was absolutely medically necessary. Dr. Steen explained to the Plaintiff that a cathe[te]rization was necessary in order to retrieve the urine sample because the Plaintiff would not provide a urine sample. I recall the Plaintiff did not voice any objection to the cathe[te]rization once Dr. Steen ordered the same and explained the reasons for it to the Plaintiff. Plaintiff was escorted to the clinic's room wherein he voluntarily climbed on the stretcher. I recall the Plaintiff had handcuffs on for security purposes. Nurse Fulton explained the cathe[te]rization procedure and the sterilization procedure. I was in the room and observed this exchange. The Plaintiff did not object, fight, squirm

or resist the procedure. I never heard the Plaintiff refuse the procedure or object to the cathe[te]rization. The procedure was completed without any complications. Plaintiff's pants were immediately pulled up. I am not aware of any personnel in the clinic laughing at any time. Dr. Steen entered the room and asked that I retrieve a medication known as Lopressor to administer to the Plaintiff to control the tachycardia. The Plaintiff refused the medication and I washed the medication down the sink. Upon the Plaintiff's refusal of the Lopressor, Plaintiff was discharged from care for refusal of medical treatment and noncompliance. All medical treatment rendered to Plaintiff was appropriate. At no time did I personally hear Plaintiff refuse the cathe[te]rization procedure. He did not fight or object to the procedure to my knowledge.

McCaskill Aff., ECF No. 35-4, p. 2-3

Nurse Fulton's affidavit alleges:

I was given a verbal order by Dr. Steen to cathe[te]rize the Plaintiff in order to obtaina[] urine sample. I met the Plaintiff in the hallway while he was speaking with Dr. Steen. Dr. Steen explained that the urine sample was medically necessary in order to ensure the Plaintiff did not have any substances in his system that could counteract with any medication administered by Dr. Steen to treat Plaintiff's tachycardia. The cathe[te]rization procedure was explained to the Plaintiff and the necessity for doing the procedure. The Plaintiff then voluntarily walked to the clinic examination room on his own. He was not dragged or pulled into the examination room, The Plaintiff climbed on the stretcher himself under his own power. At no time was he held down by any correctional officer or anyone else. Nurse McCaskill was observing in the room as I again explained the procedure to the Plaintiff. The Plaintiff verbalized his understanding of the procedure and did not verbalize any objections to me or any other medical staff that I am aware of. The procedure was performed by me without any complications. The Plaintiff was cooperative during the procedure. At no time did the Plaintiff object to the procedure, squirm or fight. In fact, had the Plaintiff fought or been held down, it would have been very difficult to perform the procedure as the cath would not have entered through a flexed muscle wall. A sample was taken, the Plaintiff's pants were immediately pulled up and I handed the sample to Nurse McCaskill. I left the room at the conclusion of the procedure and had no further contact with the Plaintiff. All medical treatment rendered to Plaintiff was appropriate. At no time did I personally hear Plaintiff refuse the cathe[te]rization procedure nor am I aware of Plaintiff stating his objections to a medical staff member. He did not fight or object to the procedure to my knowledge.

Fulton Aff., ECF No. 35-5, p. 2-3.

11

As noted above, on December 4, 2012, Plaintiff filed his Motion to Amend. Attached to the Motion is a copy of the "synopsis of investigation" of the SCDC's Office of Inspector General's Division of Investigation's report of the May 25, 2011 incident involving Plaintiff, which is the basis of the instant case. The report, designated as case no. 30-0798, is dated July 14, 2011, and was prepared by Lloyd R. Greer. The investigative report was provided to Plaintiff by Defendants' counsel, "as though it is a request to produce as governed by the Federal Rules of Civil Procedure," although Plaintiff initially sought to obtain the report through a FOIA request to SCDC. (Motion to Amend, ECF No. 44-21, p. 1).

A copy of the complete investigative report, contained in Defendants' Response in Opposition to Plaintiff's Motion to Compel (Response, ECF No. 55-1, p. 10-31), was recently filed as an attachment to Defendants' Response. Defendants' counsel states that the complete report was provided to Plaintiff on February 4, 2013, in response to Plaintiff's First Request for Production of Documents, and that a copy of Dr. Moore's policy (ECF No. 55-2, p. 7), was provided to Plaintiff on May 28, 2013, in Defendants' Response to Plaintiff's Second Request for Production of Documents.

## APPLICABLE LAW

### Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News &

12

Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'"  Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

### (1) Defendants William Byars, Dept. of Corrections Director, and Anthony Padula, Warden

Defendants argue that Plaintiff makes no allegations of personal involvement on the part of any supervisory employees.  Therefore, any supervisory role of a Defendant asserted by the Plaintiff fails, as there is no respondeat superior or vicarious liability under §1983.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  In §1983 actions, "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the Plaintiff's rights."  Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). Motion, ECF No. 35-1, p. 8.  Plaintiff argues that Defendant Byars should have been made aware of the investigation of Plaintiff's complaint that was conducted by the DOI.  However, any information developed by the investigation could only have come to light and been brought to the attention of Byars and Padula, after the incident on May 25, 2011. Plaintiff argues that Padula's response to his grievance was not proper and indicated that he condoned  the alleged actions of the other Defendants.  However, because the "Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by the state," Adams v. Rice, 40 F.3d 72, 75 (4th Cir.

13

1994), claims of improper handling of grievances do not state a claim under §1983. Hendricks v. Galloway, 2004 WL 3090229 (D.S.C. 2004). Plaintiff has failed to make any allegations in his Amended Complaint and affidavit showing the personal involvement of Byars and Padula in any of the alleged wrongs. Simply put, there is no causal relation between the alleged conduct of these two Defendants and Plaintiff's alleged constitutional injury; Byars and Padula are therefore entitled to summary judgment.

### (2) Plaintiff's Claims for Monetary Damages Against All Remaining Defendants in Their Official Capacities

Defendants argue that Defendants, to the extent that they are being sued by Plaintiff in their official capacities for monetary damages, are not "persons" under §1983, citing Gulledge v. Smart, 691 F. Supp. 947, 955 & n.7 (D.S.C. 1988) (finding a deputy sheriff in South Carolina is more closely connected to the state than to the county and granting defendants' motion for summary judgment). Defendants assert that, as SCDC employees, they are immune under the Eleventh Amendment from a lawsuit for monetary damages brought in a federal district court. (Motion, ECF No. 35-1, p. 14-15).

Plaintiff's claims for monetary damages against Defendants, in their official capacities, are subject to summary dismissal under Hafer v. Melo, 502 U.S. 21 (1991), and Will v. Michigan Department of State Police, 491 U.S. 58, 70-71 (1989), because state officials sued for damages under § 1983 in their official capacities assume the identity of the government that employs them.[4] In Hafer, the United States Supreme Court noted that

---

[4] State officials are considered "persons" within the meaning of § 1983 when sued in their individual capacities and may be held personally liable for damages under § 1983 for their official actions, unless they have immunity from suit because they are carrying out legislative or judicial functions, or establish the defense of qualified immunity. See Hafer, 502 U.S. 21, 31 (1991).

14

a suit against a state official in his official capacity should be treated as a suit against the State.  Hafer, 502 U.S. at 25.  The court stated that "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  Id. (quoting Kentucky v. Graham, 473 U.S. 159 (1985)).  A defendant who is sued in an official capacity action is entitled to the Eleventh Amendment immunity that the governmental entity possesses.  Thus, Plaintiff's claims for monetary damages against Defendants, in their official capacities, are barred by the Eleventh Amendment.  Plaintiff's claims for monetary damages may proceed at this point only against Defendants in their individual capacities.

**(3) Plaintiff's Claims For Money Damages Against Remaining Defendants in their Individual Capacities**

<u>**Failure to Exhaust Administrative Remedies**</u>

Defendants first assert that Plaintiff's Amended Complaint should be dismissed because Plaintiff did not exhaust his administrative remedies, as required by 42 U.S.C. § 1997e(a), before filing this action pursuant to §1983 complaining of prison conditions. Defendants concede that "Plaintiff has clearly grieved his allegation that he was submitted to a 'forced catheterization,'" (Motion, ECF No. 35, p. 7), but assert that Plaintiff has not completed the grievance process for the remaining claims in his Amended Complaint.  Defendants rely on the affidavit of Ann Hallman, Chief of SCDC's Inmate Grievance Branch in which she states that Plaintiff filed three grievances, Lee CI 1104-11, Lee CI 1143-11, and Lee CI 1208-11.[5]  Lee CI 1104-11 was returned to

---

[5] Lee CI-1104-11 includes a brief factual narrative of Plaintiff's allegedly forced catheterization on May 25, 2011, and explicitly alleges that "[t]his was a violation of my 8th Amendment right under cruel and unusual punishment for excessive force."  (ECF

Plaintiff, unprocessed, because it included an additional two-sided page of information,

in violation of SCDC's Policy GA-01.12, which allows "only one additional page front

side only."  (ECF No. 35-2, p. 6).  Lee CI 1143-11 was returned, unprocessed, because,

─────────────────────

No. 35-2, p. 8).  Lee CI 1143-11 includes an even more brief factual narrative of the
explicit allegation that the incident was "a violation of [Plaintiff's] 8th Amendment rights
by SCDC employees & staff of medical by performing [a] catheterization on [Plaintiff]
without consent."  (ECF No. 35-2, p. 10).

In Lee CI 1208-11 under "state grievance," Plaintiff states: I want to grievance the
fact that I was maliciously cathe[]terized by SCDC officers and medical staff on May 25,
2011.  I went to medical this day for a migraine headache but instead ended up being
cathet[er]ized for being under some type of suspicion for drugs.  This was a violation of
my rights under the U.S. Constitution."  The "action requested" is "I would like to bring
criminal charges against Dr. Stein and Major Dean for the authorization in this malicious
act."  Plaintiff alleges that he attempted an informal resolution in that he "wrote and
spoke to Investigator Greer who is conducting an investigation.  I wrote Warden Padula
on May 26, 2011.  Still no response.  I wrote an inmate request to warden Padula."

The "action taken by IGC" was 'Your grievance has been forwarded to the
Division of Investigations for review.  This grievance will be held in abeyance until their
review is completed."  The Warden's response was "I have reviewed your grievance
and conferred with the appropriate medical staff.  The medical procedure you are
grieving was authorized by medical personnel in order to address a medical concern.  In
that I am not medically trained, I must rely on their assessment.  Therefore based on
this information, your grievance is denied."

In Plaintiff's Step 2 appeal, Plaintiff alleges "I appeal the fact that Mr. Padula has
failed to acknowledge the fact that I have a right to refuse medical treatment in
accordance with health care Policy HS-18-19.  He doesn't have to be trained in
medicine to understand policy and procedure.  This was not done in my regards.  I went
to medical on my o[w]n account.  Mr. Padula['s] denial is inaccurate."  (ECF No. 35-2, p.
5).

The "responsible official's decision and reason" was: I have reviewed your
medical encounters and grievance.  You have requested criminal charges on 2
employees.  This is not a medical action.  After reviewing your complaint, it is
unsubstantiated.  You were asking to be seen for a medical complaint, the doctor
needed a urine sample, as was explained, and you could not obtain, catheterization was
ordered and explained as was needed for diagnosis.  You agreed to this at the time.
This was not done for punishment, but for a medical diagnosis, which could have been
life-threatening.  Your grievance is denied."  (ECF No. 35-2, p. 5).

in the blank space on the grievance form under "state grievance," Plaintiff wrote "see attached sheet," and attached one additional page with writing on the front side only. However, the Inmate Grievance Coordinator stated "[y]our grievance must begin on SCDC "Grievance Form" 10-5." (ECF No. 35-2, p. 9). Plaintiff does not dispute that he did not re-file these two unprocessed grievances.

Defendants argue that "Plaintiff did not assert claims for cruel and unusual punishment, violation of due process rights, and illegal search and seizure and excessive force in the re-filed Lee CI 1208-11. As such, Plaintiff has not grieved these issues via administrative procedures." (Hallman Aff., ECF No. 35-2). Defendants cite Woodford v. Ngo, 126 S.Ct. 2378, 2386 (2006), in which the United States Supreme Court held that the PLRA exhaustion requirement requires proper exhaustion, and Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 677 (4th Cir. 2005), in which the Fourth Circuit held that exhaustion is a prerequisite to suit and must be completed prior to filing an action.

Plaintiff argues that his grievance Lee CI 1208-11 was processed and it stated, with sufficient specificity, what the grievance was about, and that Plaintiff's constitutional rights were violated, so as to alert Lee CI authorities to the nature of the wrong for which redress was sought. Plaintiff cites numerous cases from the 2nd, 7th, 9th, and 10th Circuits for the proposition that a grievant need not lay out every fact necessary to prove each element of an eventual legal claim, articulate legal theories, or demand particular relief, so long as the grievance alerts prison authorities to the problem and facilitates its resolution. Plaintiff argues that the purpose of the PLRA's administrative exhaustion requirement is to give prison officials time and opportunity to resolve problems before

17

they turn into lawsuits.  Plaintiff points out that the responses to his exhausted grievance, the information in his two unprocessed grievances, and the investigation which resulted from Lee CI 1208-11, clearly show that SCDC and its Inmate Grievance Branch were made aware of Plaintiff's claims of cruel and unusual punishment, violation of due process rights, illegal search and seizure, and excessive use of force. (Opposition, ECF No. 41, p. 4-7).

The undersigned concludes that Plaintiff's grievance Lee CI 1208-11 was sufficient in detail to alert Defendants to the claims that Plaintiff now asserts in his Amended Complaint.  Additionally, Plaintiff's exhaustion of his administrative remedies has given prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court" and led to the preparation of a useful administrative record.  See Jones v. Bock, 549 U.S. 199, 204 (2007); Moore v. Bennette, 517 F.3d 717, 721-23, 728-29 (4th Cir. 2008); Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002); Stroud v. Powell, 2011 U.S. Dist. LEXIS 136312  (E.D.N.C. Nov. 28, 2011).  See also Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009) (collecting cases) (observing that the Second, Fifth, Sixth, Ninth, and Tenth Circuits have adopted the Strong standard).  Plaintiff did not fail to exhaust his administrative remedies. Defendants' Motion for Summary Judgment on this ground should be denied.

**Qualified Immunity**

Defendants also seek summary judgment, contending they are entitled to qualified immunity. (See Dkt. No. 35-1 at 10-13 of 28.) Taking the facts in the light most

favorable to the Plaintiff, the facts do not show that Plaintiff consented to the catheterization. Plaintiff states in his Affidavit that he sought medical treatment for a headache; when he went to medical, Nurse Scott "took [Plaintiff's] vitals and said [Plaintiff] had an[n] increased heart rate." (Dkt. No. 41-2 at 2 of 6.) According to Plaintiff, Nurse Scott took the reading to Nurse Floyd, who in turn took the reading to Dr. Steen. (Dkt. No. 41-2 at 2-3 of 6.) Plaintiff states that when Nurse Floyd came back, Floyd requested a urine sample; when Plaintiff asked why, Nurse Floyd told Plaintiff "per Dr. Steen." (Dkt. No. 41-2 at 3 of 6.) Plaintiff states that he refused to provide a sample and "decided to go back to the dorm." (Id.) Nurse Floyd would not let Plaintiff leave. (Id.)

Plaintiff states that Major Dean told Plaintiff that if he did not give a urine sample, Plaintiff would be catheterized. (Dkt. No. 41-2 at 3 of 6.) Plaintiff states that he still refused, but "before being escorted" into another room, "Dr. Steen appeared and said he wanted to see if [Plaintiff] had any drugs in his system." (Id.) Plaintiff states that he "tried to ask . . . questions but [Dr. Steen] threw up his finger as if he didn't want to hear it and left." (Id.) Plaintiff states that "[n]ever once did Dr. Steen explain[] anything to [Plaintiff] before [Plaintiff] being catheterized." (Id.) Plaintiff further states in his Affidavit that after the sample was retrieved, he "was left exposed for several minutes on the bed until Major Dean told Sgt. Epps to pull up [Plaintiff's] pants." (Id.)

Defendants have moved for summary judgment on the grounds of qualified immunity. The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, this

19

doctrine "protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" Merchant v. Bauer, 677 F.3d 656, 661 (4th Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194 (2001)). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). With respect to the second prong, the court "must consider whether the constitutional right violated 'was clearly established in the specific context of the case–that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" Merchant, 677 F.3d at 662 (quoting Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir. 2002)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

Even assuming–as the Court must for purposes of Defendants' Motion for Summary Judgment–that Plaintiff did not consent to being catheterized, the undersigned concludes the Defendants are entitled to qualified immunity. The undersigned has not located any authority from the United States Court of Appeals for the Fourth Circuit concerning the issue of forced catheterization.[6] The Eighth Circuit

---

[6]The Fourth Circuit's opinion in United States v. Charters, 829 F.2d 479, 499 n.30 (4th Cir. 1987), provides no assistance, as the court therein specifically stated that it

case of <u>LeVine v. Roebuck</u>, 550 F.3d 684 (8th Cir. 2008), is factually similar to the case *sub judice*. The plaintiff in that case alleged that a correctional officer and two prison nurses violated his Fourth and Eighth Amendment rights "by forcing him to undergo catheterization to avoid prison discipline when he could not provide a urine sample for a random drug test." <u>LeVine</u>, 550 F.3d at 685. The lower court concluded that the officer violated the plaintiff's Fourth Amendment rights because "involuntary catheterization of a 68-year-old man with a history of prostate problems, as part of a random drug screening and without suspicion, is unreasonable when other less intrusive options are

---

"address[es] only the circumstances of the unconvicted defendant and express[es] no views concerning the rights of convicted prisoners facing forcible treatment with antipsychotic drugs." In <u>United States v. Evans</u>, 404 F.3d 227 (4th Cir. 2005), the Fourth Circuit stated,

> The Supreme Court has outlined different tests for when the government may involuntarily medicate an individual, depending on whether the medication is for purposes of prison control or prisoner health on the one hand, <u>see Washington v. Harper</u>, 494 U.S. 494 U.S. 210, 227, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that involuntary medication of an inmate with a serious mental illness is constitutionally appropriate where the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest), or, on the other hand, for the purpose of prosecuting an incompetent defendant, <u>see Sell v. United States</u>, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (<u>Sell</u>). In <u>Sell</u> the Supreme Court admonished that [a] court need not consider whether to allow forced medication for [the purpose of rendering the defendant competent to stand trial], if forced medication is warranted for a different purpose, such as the purposes set out in <u>Harper</u> related to the [imprisoned] individual's dangerousness, or purposes related to the [imprisoned] individual's own interests where refusal to take drugs puts his health gravely at risk. 123 S.Ct. at 2185 (emphasis in original).

<u>Evans</u>, 404 F.3d at 235 n.3; <u>see also Rendleman v. Scott</u>, 378 Fed. App'x 309, 313 (4th Cir. 2010) ("[T]he State's right to obtain the DNA sample from designated inmates must necessarily carry with it the right to use a reasonable degree of force that is sufficient to ensure compliance.").

available, such as keeping [the plaintiff] in a room until he was able to urinate." Id. at

688. Despite this conclusion, the district court concluded the officer was entitled to

qualified immunity "because the law of the Eighth Circuit was not clearly established at

the time of her actions." Id. The LeVine decision, which predated the Supreme Court's

ruling in Pearson v. Callahan, noted the criticism of the "order-of-battle" rule set forth in

Saucier: "if the defendant loses the constitutional question but wins on qualified

immunity, the rule may immunize an incorrect constitutional ruling from review." Scott v.

Harris, 550 U.S. 372, 388 (2007) (Bryer, J., concurring). The Eighth Circuit stated,

> That concern is present in this case, because the **district court has
> posited a constitutional right that is both unprecedented in prior
> cases** and so far removed from a plausible interpretation of the facts that
> it appears to be an impermissible advisory opinion. We need not resolve
> the dilemma, however, because the court's constitutional ruling depended
> upon an assumed fact for which there is no support in the record.
> Accordingly, applying the Saucier order of battle, we conclude that no
> constitutional violation has been shown without considering or approving
> the constitutional right posited by the district court.

LeVine, 550 F.3d at 688 (emphasis added).

The "critical fact assumed by the district court" was that the officer "ordered the

prison's medical professionals to perform an involuntary catheterization." Id. The court

continued,

> Absent this fact, the record viewed most favorably to [the plaintiff] shows
> that [the officer] threatened or warned [the plaintiff] that he would be
> subject to discipline for being unable to produce a urine specimen, which
> was consistent with § III.B.4 of the Department's drug testing policy. When
> [the plaintiff] could not provide a sample, [the officer] could have returned
> him to his cell, written up his failure, and left to others the ultimate
> question of discipline. Instead, after learning of his enlarged prostate from
> [the plaintiff] and the medical staff, [the officer] directed correctional officer

22

> Dunlap to take [the plaintiff] to the medical unit for catheterization, a procedure [the plaintiff] had undergone twice before when he "couldn't urinate." [The plaintiff's] complaint and deposition testimony alleged, not that he refused the procedure, but that his consent or acquiescence was induced by the threat of prison discipline. But even if [the officer] ordered [the plaintiff] to go to the medical unit, she had no contact with the medical professionals after he arrived and no authority to direct those professionals to undertake the catheterization procedure if they thought it medically inappropriate or if patient [plaintiff] refused to consent. [The plaintiff] did not sue Officer Dunlap and makes no claim that he ordered the medical professionals to undertake the catheterization, an action that would have been beyond Dunlap's knowledge and authority. Liability for damages under § 1983 is personal. Doran v. Eckold, 409 F.3d 958, 965 (8th Cir.2005) (en banc). The district court erred in concluding that [the officer] violated [the plaintiff's] Fourth Amendment rights because [the plaintiff] presented no evidence that [the officer] was personally responsible for any involuntary catheterization that occurred.

LeVine, 550 F.3d at 688-89.

Turning to the prison nurses, the Eighth Circuit upheld the district court's

conclusion that they were entitled to qualified immunity:

> The district court concluded that the actions of nurses Roebuck and Greim as medical staff were objectively reasonable in light of clearly established law because they "were simply following a request from Youngs." Citing Sparks and Spence, [the plaintiff] argues that these nurses "were aware, or minimally should be aware, that an involuntary catheterization for a non-medical purpose is against a prisoner's 4th Amendment rights." **But that proposition was not clearly established by those cases, or by any other**. Given the undisputed evidence that [the plaintiff] had undergone voluntary catheterization in the past when he was unable to urinate, and that the nurses used proper technique in attempting this rather common and safe though painful procedure, the grant of qualified immunity must be upheld. See Sparks, 71 F.3d at 261.

LeVine, 550 F.3d at 689 (emphasis added). Turning to the plaintiff's Eighth Amendment

claims, the Eighth Circuit affirmed the grant of summary judgment to defendants

23

because there was no evidence "that any defendant used force maliciously and sadistically or for the purpose of causing" harm to the plaintiff. Id. at 689-90.

The Eighth Circuit's opinion stops far short of recognizing the constitutional right described by the district court, but the Eighth Circuit does specifically reject the plaintiff's assertion that nurses were aware, or minimally should be aware, that an involuntary catheterization for a non-medical purpose is against a prisoner's Fourth Amendment rights. See LeVine, 550 F.3d at 689. Spence v. Farrier, 807 F.2d 753 (8th Cir. 1986), indicates that random urinalysis of inmates did not violate the Fourth Amendment, but that case did not involve involuntary catheterization. As the LeVine court noted, involuntary catheterization was at issue in Sparks v. Stutler, 71 F.3d 259 (7th Cir. 1995), but without concluding the Fourth Amendment had been violated, the Seventh Circuit reversed the trial court's denial of qualified immunity. Furthermore, in Sparks, there was a reasonable suspicion of drug use. The LeVine court further noted,

> In another group of cases, exemplified by Tinius v. Carroll County Sheriff Dept., 321 F.Supp.2d 1064, 1070, 1074-76 (N.D. Ia. 2004), courts have held that involuntary catheterization to obtain a urine sample for medical purposes-such as determining the proper course of treatment-does not violate the Fourth Amendment.

LeVine, 550 F.3d at 687-88.

On this authority–none of which exists in the Fourth Circuit–it is difficult to say that the Defendants "transgress[ed] bright lines." Maciariello, 973 F.2d at 298. Even under Plaintiff's version of the events, he went to medical seeking medical treatment for a headache. When his pulse was fast, the doctor told Plaintiff he wanted a drug screen to see if any drugs were in Plaintiff's system. Dr. Steen's Affidavit states that Plaintiff

was "jittery," and Dr. Steen "was immediately concerned that [Plaintiff] may be under the influence of a narcotic or have some sort of narcotic in his system." (Steen Aff. ¶ 5.) Dr. Steen further stated, "I felt a urine test was warranted and medically necessary in order to rule in or out certain stimulate agents in Plaintiff's system. I did not want to administer a narcotic for Plaintiff's tachycardia that could interact with a stimulate already in Plaintiff's system." (Steen Aff. ¶ 6.) Under Plaintiff's version of the events, the catheterization occurred even though Plaintiff objected, but it also occurred for a medical reason. On these facts, the undersigned recommends concluding Defendants are entitled to qualified immunity on all of Plaintiff's federal claims. LeVine v. Roebuck, 550 F.3d 684; Lockhard v. City of Lawrenceburg, Ind., 815 F. Supp. 2d 1034, 1051 (S.D. Ind. 2011) (stating, in the context of a § 1983 action stemming from the forced catheterization of the plaintiff after he had already voluntarily provided a blood sample to comply with a search warrant that required both samples, "In light of this somewhat diverging patchwork of well-reasoned cases, the Court cannot help but find the individual defendants are entitled to qualified immunity shielding them from liability. This case is in nebulous territory."); Miller v. Idaho State Patrol, 252 F.3d 1274, 1285 (Idaho 2011) ("Even though courts nationwide have not had many opportunities to address forced catheterizations, there are some areas where cases appear to be coalescing into universal rules. . . . On the other hand, a forced catheterization performed on arrestees solely for medical screening or treatment, and not for investigatory reasons, is constitutional."); Meyer v. Woodward, 617 F. Supp. 2d 554, 565-66 (E.D. Mich. 2008) ("Even assuming Plaintiff did not consent to the catheterization, it is not clearly established that he had a right to refuse. As discussed above, the state has an interest

25

in ensuring the medical stability of its detainees. . . . A doctor determined that a

catheterization was a medically necessary procedure. Thus, it is not clear that Plaintiff

had a right to refuse the treatment."); see also Bell v. Wolfish, 441 U.S. 520, 559 (1979)

(finding that body cavity searches are reasonable under the Fourth Amendment

because in prisons the "[s]muggling of money, drugs, weapons, and other contraband is

all too common an occurrence").[7]

---

[7]On or about November 29, 2012, Plaintiff filed a document he entitled "Motion to Amend Response to Summary Judgment and/or Supplement." (Dkt. No. 44.) To the extent Plaintiff wishes to supplement or amend his Response in Opposition to Defendants' Motion for Summary Judgment, that request should be granted. The undersigned has considered the documents in this filing for purposes of addressing Defendants' Motion for Summary Judgement. To the extent Plaintiff seeks to amend his Complaint, however, that request should be denied. In his filing, Plaintiff states that he "received discovery material from Defendants dated Nov. 19, 2012," which "names more defendants who could be involved in this matter." (Dkt. No. 44 at 1 of 3.) As the Fourth Circuit stated in Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986), "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." The undersigned recommends denying the Plaintiff's motion to amend his complaint. As a preliminary matter, Plaintiff did not file a proposed amended complaint. Based on the document attached to Plaintiff's motion, it appears that Plaintiff may seek to add Dr. Thomas Moore as a defendant. (See Dkt. No. 44-1.) This Investigative Report references a memorandum distributed by Dr. Thomas Moore, then medical director of SCDC. (Dkt. No. 44-1 at 4 of 4.) This document provides,

> A copy of the memorandum distributed by Dr. Thomas Moore, Medical
> Director, was obtained and reviewed. In the undated memorandum, Dr.
> Moore stated that he wanted to address two issues, medical passes and
> urine drug screens. In reference to urine drug screens, Dr. Moore stated:
> "Inmates will not be given passes to avoid observed drug screens.
> Inmates who are unable to urinate will be cathed."

(Dkt. No. 44-4 at 4 of 4.) According to this document, SCDC's general counsel was concerned with this policy and indicated he would send a letter to Dr. Moore and Dr. Solomon expressing his views. (Id.) The document further provides that when Dr. Moore was questioned about the letter, "Dr. Moore stated that the letter was not thought through properly and should not have been sent in its current form, and this has since been rectified." (Id.)

The undersigned recommends denying any request to amend the Complaint to

**(4) <u>Declaratory and Injunctive Relief</u>**

In his Amended Complaint, Plaintiff seeks a "declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States." (Dkt. No. 16 at 3 of 4.) Plaintiff also seeks a "preliminary and permanent injunction ordering Defendants . . . to not subject Plaintiff to any more invasive techniques and release [Plaintiff] out of Defendants custody and release[ Plaintiff] to federal custody." (<u>Id</u>.) Plaintiff is no longer incarcerated at Lee CI; he is now incarcerated at Wateree Correctional Institution, and, to the extent his Amended Complaint is based on policy, Plaintiff's filing of November 29, 2012, indicates that policy is no longer in use. (Dkt. No. 44-1.) The undersigned therefore recommends dismissing these requests as moot. <u>See Incumaa v. Ozmint</u>, 507 F.3d 281, 286 (4th Cir. 2007) ("Mootness questions often arise in cases involving inmate challenges to prison policies or conditions, and courts, including our own, have held the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief, even if a claim for money damages survives."); <u>Magee v. Waters</u>, 810 F.2d 451, 452 (4th Cir. 1987) ("Because the prisoner has been transferred, his request for injunctive relief is moot."); <u>see also City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [the plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles . . . .").

---

add Dr. Moore as a defendant. While such a policy is certainly ill-advised, for the reasons set forth above, qualified immunity applies, and amendment would be futile.

## **CONCLUSION**

Wherefore, it is ORDERED that Plaintiff's Motion to Compel (Dkt. No. 54) is GRANTED IN PART and DENIED IN PART, as set forth in Footnote 2.

IT IS SO ORDERED.

Wherefore, It is RECOMMENDED that Plaintiff's Motion to Amend (Dkt. No. 44) be GRANTED IN PART and DENIED IN PART. To the extent Plaintiff wishes to Amend his Complaint, that request should be denied; to the extent Plaintiff wishes to amend his Response in Opposition to Defendants' Motion for Summary Judgment, that request should be granted.

It is further RECOMMENDED that Defendants' Motion for Summary Judgment (Dkt. No. 35) be GRANTED as to Plaintiff's claim for money damages, and that Plaintiff's request for declaratory and injunctive relief be DISMISSED.

IT IS SO RECOMMENDED.

August 2, 2013                                         s/Bruce Howe Hendricks
Charleston, South Carolina                 United States Magistrate Judge

**The parties' attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).